810 F.2d 1477
 43 Fair Empl.Prac.Cas. 130,
42 Empl. Prac. Dec. P 36,809, 55 USLW 2486
 Frank ATONIO, Eugene Baclig, Randy del Fierro, Clarke Kido,
Lester Kuramoto, Alan Lew, Curtis Lew, Robert Morris,
Joaquin Arruiza, Barbara Viernes, as administratrix of the
estate of Gene Allen Viernes, and all others similarly
situated, Plaintiffs-Appellants,
v.
WARDS COVE PACKING COMPANY, INC., Castle & Cooke, Inc., and
Columbia Wards Fisheries, Defendants-Appellees.
 Nos. 83-4263, 84-3527.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted En Banc
Feb. 18, 1986.
Decided Feb. 23, 1987.
 
 Abraham A. Arditi, Seattle, Wash., for plaintiffs-appellants.
 Douglas M. Fryer, Seattle, Wash., for defendants-appellees.
 Bill Lann Lee, Los Angeles, Cal., Robert E. Williams, Washington, D.C., for amicis curiae.
 Appeal from the United States District Court for the Western District of Washington.
 Before BROWNING, GOODWIN, WALLACE, SNEED, ANDERSON, HUG, TANG, SCHROEDER, FLETCHER, PREGERSON, and REINHARDT, Circuit Judges.
 TANG, Circuit Judge:
 
 
 1
 We grant en banc review in this Title VII race discrimination case to decide two questions. First, we decide the procedure a panel should follow when faced with an irreconcilable conflict between the holdings of controlling prior decisions of this court. Second, we resolve that irreconcilable conflict, by deciding that disparate impact analysis may be applied to subjective employment practices. The district court declined to apply disparate impact analysis on the authority of Heagney v. University of Washington, 642 F.2d 1157 (9th Cir.1981) (practice of hiring without well-defined criteria cannot be subjected to disparate impact analysis) and chose to disregard the later decision in Wang v. Hoffman, 694 F.2d 1146 (9th Cir.1982) (lack of objective criteria for promotion can be analyzed for disparate impact). The Ninth Circuit panel that heard the appeal from the judgment for the employers in the instant case noted our conflicting decisions but held it was bound by Heagney because it expressed the "correct view" or, alternatively, because it was the decision "first in line." Atonio v. Wards Cove Packing Co., Inc., 768 F.2d 1120, 1132 and n. 6 (9th Cir.1985), withdrawn, 787 F.2d 462 (9th Cir.1985).
 
 
 2
 The panel's approach did not resolve the broader question of how future panels should decide a case controlled by contradictory precedents. We now hold that the appropriate mechanism for resolving an irreconcilable conflict is an en banc decision. A panel faced with such a conflict must call for en banc review, which the court will normally grant unless the prior decisions can be distinguished. Despite the "extraordinary" nature of en banc review, United States v. American-Foreign Steamship Corp., 363 U.S. 685, 689, 80 S.Ct. 1336, 1339, 4 L.Ed.2d 1491 (1960), and the general rule that en banc hearings are "not favored," Fed.R.App.P. 35(a), en banc review is proper "when consideration by the full court is necessary to secure or maintain the uniformity of its decisions." Fed.R.App.P. 35(a)(1); see also American-Foreign Steamship, 363 U.S. at 689-90, 80 S.Ct. at 1339-40.
 
 
 3
 Turning to the substantive question which produced our conflicting prior decisions, we note that this case arises out of the cannery workers' allegations of both disparate treatment and disparate impact. Thus it affords us the opportunity to refine the analytic tools for the identification and eradication of unlawful discrimination. Specifically, we now determine that disparate impact analysis may be applied to subjective employment practices.
 
 I. BACKGROUND
 
 4
 Former salmon cannery workers brought a class action suit charging three companies with employment discrimination on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq. (1982) and the Civil Rights Act of 1866, 42 U.S.C. Sec. 1981 (1982). The class alleged both disparate treatment and disparate impact claims on behalf of minority persons. It alleged that the pronounced concentration of Asian and Alaska Native employees in the lowest paying cannery worker and laborer positions and the relative scarcity of such minority employees in the higher paying positions proved disparate treatment of minority people. It also alleged that certain specific employment practices of the companies proved both disparate treatment of and disparate impact on minority people. The cannery workers challenged the companies' use of separate hiring channels for cannery workers from those used for the higher paying, at-issue jobs, as well as word-of-mouth recruitment, nepotism, rehire policies, and the lack of objective job qualifications.
 
 
 5
 The majority of cannery workers are hired from native villages in Alaska and through a local union of primarily Filipino members of the International Longshoremen's and Warehousemen's Union (ILWU) in Seattle. Consequently, cannery workers are almost all members of these ethnic groups. All other positions are filled through applications received during the off-season at the mainland home offices, through rehiring previous employees and through word-of-mouth recruitment. These positions are held predominantly by white people. Another challenged practice, of particular relevance in our en banc review of this case, is the apparent lack of objective qualifications for many job classifications, and the resultant use of subjective criteria in hiring and promoting. When filling most job positions, the respective hiring officers generally seek to hire the individuals who are, in the hiring officer's opinion, the best for the job.
 
 
 6
 In addition to the racial stratification of jobs, the cannery workers complain that even those nonwhites who obtain positions with the companies are treated differently from whites. They allege that nonwhites are segregated from whites in housing and messing, and that the bunkhouses and food provided for nonwhites are far inferior to those provided for whites.
 
 
 7
 In holding for the defendant companies, the district court evaluated the evidence introduced by both sides, including conflicting statistical data. The court analyzed all the cannery workers' claims for intentional discrimination, and concluded that the companies had successfully shown nondiscriminatory motivations for their practices. Despite the cannery workers' contrary arguments, the court, relying on Ninth Circuit authority, refused to evaluate all of the claims under the disparate impact model of Title VII. The court subjected a few claims to disparate impact analysis and again found for the defendants.
 
 II. ANALYSIS
 A. Title VII Liability
 
 8
 Section 703(a)(2) of Title VII, 42 U.S.C. Sec. 2000e-2(a)(2) (1982), provides that:
 
 
 9
 It shall be an unlawful employment practice for an employer--
 
 
 10
 ....
 
 
 11
 (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
 
 
 12
 An employee may prove an employer's Title VII liability through a theory of disparate treatment or a theory of disparate impact. Proof of disparate treatment requires a showing that the employer intentionally "treats some people less favorably than others because of their race, color, religion, sex, or national origin." International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854-55 n. 15, 52 L.Ed.2d 396 (1977). An illicit motive may be inferred in an individual discrimination claim when the plaintiff shows he is a member of a protected class who applied for, and failed to get, a job for which he was qualified and which remained open after his rejection. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). An illicit motive may be inferred in a class-wide discrimination claim from a sufficient showing of disparity between the class members and comparably qualified members of the majority group. Segar v. Smith, 738 F.2d 1249, 1265-66 (D.C.Cir.1984), cert. denied, 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985) (citing Teamsters, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854-55 n. 15).
 
 
 13
 A disparate impact claim challenges "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." Teamsters, 431 U.S. at 336 n. 15, 97 S.Ct. at 1854-55 n. 15. Illicit motive is irrelevant because impact analysis is designed to implement Congressional concern with "the consequences of employment practices, not simply the motivation." Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971) (emphasis in original). In a class action suit, commonly known as a "pattern or practice" case, plaintiffs typically assert claims both of disparate treatment occasioned by an employer's practices and of disparate impact produced by those practices. Segar, 738 F.2d at 1266. As the Supreme Court noted in Teamsters, a pattern and practice class action case, "[e]ither theory may, of course, be applied to a particular set of facts." 431 U.S. at 336 n. 15, 97 S.Ct. at 1854-55 n. 15.
 
 B. Impact Analysis in the Ninth Circuit
 1. Conflict
 
 14
 Disparate treatment and disparate impact are but two analytic tools which may be used in the appropriate Title VII case to resolve the ultimate question, whether there has been impermissible discrimination by an employer. See, e.g., Goodman v. Lukens Steel Co., 777 F.2d 113, 130 (3d Cir.1985). Despite the Teamsters language stating that either theory may be applied to a set of facts, courts have not uniformly interpreted the scope of impact analysis.[1] Differences have arisen from the conflicting views of whether impact analysis can be applied to evaluate employment procedures or criteria different from the objective test and diploma requirement scrutinized in the seminal Griggs decision or the height and weight requirements analyzed in Dothard v. Rawlinson, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977).[2]
 
 
 15
 This circuit has clearly held that subjective practices and decisions are not illegal per se. Heagney v. University of Washington, 642 F.2d 1157, 1163 (9th Cir.1981). At the same time, we have stated that subjective practices are particularly susceptible to discriminatory abuse and should be closely scrutinized. Kimbrough v. Secretary of United States Air Force, 764 F.2d 1279, 1284 (9th Cir.1985); Nanty v. Barrows Co., 660 F.2d 1327, 1334 (9th Cir.1981). The conflict in our decisions has developed because prior panels have not all agreed that the close scrutiny of subjective practices can or should take the form of a disparate impact analysis.
 
 
 16
 In Heagney, the plaintiff challenged the University's power to classify certain jobs as "exempt" from state personnel laws, which, in turn, gave the school more discretion in setting salaries. We held that the crux of the complaint was an objection to the lack of well-defined criteria, which could not be equated with practices such as personnel tests or minimum physical requirements. Thus, although we had previously noted that both treatment and impact analysis may be applied, we held that impact analysis was inappropriate. Heagney, 642 F.2d at 1163. We followed Heagney in O'Brien v. Sky Chefs, 670 F.2d 864, 866 (9th Cir.1982) and refused to apply impact analysis to an employer's lack of well-defined promotion criteria, noting that the lack of such criteria does not per se cause an adverse impact.
 
 
 17
 On the other hand, this court has applied impact analysis to subjective criteria in at least two cases. In Wang v. Hoffman, 694 F.2d 1146, 1148 (9th Cir.1982), which challenged the hiring and promotion policies of the Army Corps of Engineers, the panel held that a promotion system lacking objective criteria could be challenged for its disparate impact, and in Peters v. Lieuallen, 746 F.2d 1390, 1392 (9th Cir.1984), the panel held that impact analysis could be applied to subjective criteria used during interviews to screen candidates, but that the plaintiff must show that use of the criteria caused the adverse impact. See also Yartzoff v. Oregon, 745 F.2d 557, 558 (9th Cir.1984) (impact analysis of subjective promotion criteria appropriate in age discrimination case, but plaintiff failed to offer proof of disparate impact).
 
 
 18
 In subsequent cases we have recognized the conflict between Heagney and Wang, but felt it unnecessary to resolve the question. See Moore v. Hughes Helicopters, Inc., 708 F.2d 475, 481 (9th Cir.1983) (noting that "[t]he law in this court is unsettled" stated disparate treatment focus well suited to analysis of subjective decision making); Spaulding v. University of Washington, 740 F.2d 686, 709 (9th Cir.) (lack of well defined criteria facilitating wage discrimination better presented under disparate treatment model on the authority of Heagney, followed by a "but cf." citation to Wang ), cert. denied, 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984).
 
 2. Resolution
 
 19
 We now hold that disparate impact analysis may be applied to challenge subjective employment practices or criteria provided the plaintiffs have proved a causal connection between those practices and the demonstrated impact on members of a protected class. The three elements of the plaintiffs' prima facie case are that they must (1) show a significant disparate impact on a protected class, (2) identify specific employment practices or selection criteria and (3) show the causal relationship between the identified practices and the impact. We are persuaded that this holding comports with the express language of the statute, the intent of Congress as revealed in its discussions of the 1972 amendments, the enforcement agencies' interpretation, and the broad prophylactic purposes of Title VII.
 
 3. Rationale
 
 20
 a. Statutory Language
 
 
 21
 We begin with the observation that Title VII proscribes all forms of employment discrimination. It does so without reference to either objective or subjective practices. Title VII states that it is an unlawful employment practice "to limit, segregate, or classify ... employees or applicants for employment in any way." 42 U.S.C. Sec. 2000e-2(a)(2)(1982) (emphasis added). The Supreme Court construed this language as proscribing "not only overt discrimination but also practices that are fair in form, but discriminatory in operation." Griggs, 401 U.S. at 431, 91 S.Ct. at 853. The Court developed the disparate impact model for proving discrimination in recognition of Congress' intent to remove "artificial, arbitrary, and unnecessary barriers to employment." Id. Although Griggs involved requirements of a high school diploma and an objective test, the opinion did not expressly limit impact analysis to such criteria.
 
 
 22
 b. Congressional Intent
 
 
 23
 There is considerable evidence that Congress endorsed the Griggs decision during discussion of amendments to Title VII in 1972. H.R.Rep. No. 238, 92d Cong., 1st Sess. 19, 24 (1971), reprinted in 1972 U.S.Code Cong. & Ad.News 2137, 2164; S.Rep. No. 415, 92d Cong., 1st Sess. 1, 14-15 (1971); Connecticut v. Teal, 457 U.S. 440, 447 n. 8, 102 S.Ct. 2525, 2531 n. 8, 73 L.Ed.2d 130 (1982); see Helfand and Pemberton, The Continuing Vitality of Title VII Disparate Impact Analysis, 36 Mercer L.Rev. 939, 948-54 (1985). The section-by-section analyses of the 1972 amendments submitted to both houses of Congress expressly stated that in areas not addressed by the amendments, existing case law was intended to continue to govern. 118 Cong.Rec. 7166, 7564 (1972); Teal, 457 U.S. at 447 n. 8, 102 S.Ct. at 2531 n. 8. Thus, although Title VII was not amended specifically to extend disparate impact analysis to subjective practices, decisional law incorporated at that time included not only Griggs, but such cases as United States v. Bethlehem Steel Corp., 446 F.2d 652, 657-58 (2d Cir.1971), which applied Griggs to invalidate subjective hiring standards and procedures.
 
 
 24
 c. Enforcement Agencies' Interpretation
 
 
 25
 Additional authority for our decision to apply the disparate impact model is found in the announcement of the four agencies charged with enforcement of Title VII--the Equal Employment Opportunity Commission, the Office of Personnel Management, the Department of Justice and the Department of Labor--that the law requires application of the disparate impact model to all selection procedures whether subjective or objective. Griffin v. Carlin, 755 F.2d 1516, 1525 (11th Cir.1985). The Uniform Guidelines on Employee Selection Procedures, adopted in 1978, define the procedures to which impact analysis applies as:
 
 
 26
 [a]ny measure, combination of measures, or procedure used as a basis for any employment decision. Selection procedures include the full range of assessment techniques from ... physical, educational, and work experience requirements through informal or casual interviews.
 
 
 27
 29 C.F.R. Sec. 1607.16(Q) (1985).
 
 
 28
 Because the statutory language and legislative history support the administrative interpretation, the guidelines are "entitled to great deference," and can be treated as "expressing the will of Congress." Griggs, 401 U.S. at 434, 91 S.Ct. at 855.
 
 
 29
 d. Purpose of Title VII
 
 
 30
 Applying the tool of disparate impact analysis to subjective practices and criteria is necessary to fully implement the prophylactic purpose of Title VII to achieve equal employment opportunity and remove arbitrary and unnecessary barriers which have operated to favor white male employees over others. Teal, 457 U.S. at 451, 102 S.Ct. at 2532-33; Teamsters, 431 U.S. at 364, 97 S.Ct. at 1869; Griggs, 401 U.S. at 431, 91 S.Ct. at 853. It is essential precisely because such practices will quite often lack any discriminatory animus. Subjective practices can operate as " 'built-in headwinds' " for minority groups as readily as can objective criteria, Griggs, 401 U.S. at 432, 91 S.Ct. at 854, and these practices should likewise be exposed and eradicated when they cause adverse impact without proof of a redeeming business necessity. The Supreme Court has not held otherwise.
 
 
 31
 e. Furnco
 
 
 32
 There has been considerable discussion about the meaning of Furnco Construction Corp. v. Waters, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). Some courts and commentators suggest the Supreme Court restricted the application of Griggs impact analysis to objective criteria.[3] The majority of circuits, however, do not subscribe to this reading of Furnco and have applied impact analysis to subjective practices.[4]
 
 
 33
 The employment practice challenged in Furnco was the refusal to accept jobsite applications for bricklayers to reline blast furnaces with firebrick. Instead, the job superintendent hired only bricklayers he knew were experienced or who had been recommended by his foremen. Furnco, 438 U.S. at 570, 98 S.Ct. at 2946. In applying the McDonnell Douglas formula of disparate treatment the Court noted the case did not implicate employment tests previously treated in Griggs and Albemarle Paper Co. v. Moody, 422 U.S. 405, 412-13, 95 S.Ct. 2362, 2369-70, 45 L.Ed.2d 280 (1975) (Moody ), or particularized physical requirements such as those discussed in Dothard, 433 U.S. at 329, 97 S.Ct. at 2726-27, and that it was not a pattern and practice case as was Teamsters, 431 U.S. at 358, 102 S.Ct. at 1866, Furnco, 438 U.S. at 575 n. 7, 98 S.Ct. at 2948-49 n. 7.
 
 
 34
 We do not read this footnote to preclude impact analysis of the claims presented in the case at bar. Clearly, the facts giving rise to allegations of discrimination may support a prima facie case of disparate treatment or disparate impact. See, Teamsters, 431 U.S. at 336 n. 15, 102 S.Ct. at 1854-55 n. 15 ("[e]ither theory may, of course, be applied to a particular set of facts.") In other words, Furnco imposes no limitation on use of impact analysis beyond the restrictions inherent in demonstrating a prima facie case.
 
 
 35
 The Furnco plaintiffs identified a specific practice, but were unable to prove that the practice had an adverse impact on black bricklayers. 438 U.S. at 571, 98 S.Ct. at 2946. Because they failed to demonstrate disparate impact, they failed to establish a prima facie case of disparate impact, and thus, use of that analytic tool was inappropriate.
 
 
 36
 In contrast, the plaintiffs in this case contend they are consigned to lower paying jobs by a system of racial segregation implemented through a variety of specific employment practices. The statistics provide evidence of a significant disparate impact and the challenged practices are agreed to cause disparate impact. Thus, these plaintiffs are entitled to the application of impact analysis as an appropriate analytic tool to challenge the discriminatory effect of the companies' practices because they have satisfied the elements of the prima facie case: a significant disparate impact on a protected class, the identification of specific employment practices or selection criteria and a causal relationship between the identified practice and the impact.
 
 
 37
 f. Logic Supports Impact Analysis
 
 
 38
 Although the language of the statute and Congressional discussions of Title VII, as well as Supreme Court pronouncements are sufficient authority for the application of disparate impact analysis to subjective employment practices, we should also note that we are unpersuaded by the defendants' objections to our decision based on appeals to logic or social policy. Defendants argue that there is a logical basis for a distinction between objective and subjective practices and for the correlative categorization of the analysis of the proof of impermissible discrimination. In their view subjective practices are by nature and definition based upon intent and thus should be evaluated only for discriminatory animus. They argue that only objective practices can be evaluated for disparate impact.
 
 
 39
 We disagree. Subjective practices may well be a covert means to effectuate intentional discrimination, as the defendants point out, but they can also be engendered by a totally benign purpose, or carried on as a matter of routine adherence to past practices whose original purposes are undiscoverable. Subjective practices are as likely to be neutral in intent as objective ones.[5] If, in fact, the subjective practices are a "covert means" to discriminate intentionally, by definition intent will be difficult to prove. If the practices are the cause of adverse impact, the purposes of Title VII are well-served by advancing proof of adverse impact, thereby obviating the necessity of proving intent. Proof of intent where adverse impact can be shown may be not only unnecessary but undesirable because of the animus the process generates.
 
 
 40
 We also do not agree that only objective practices can be analyzed for disparate impact. When we view employment practices from the perspective of their impact on a protected class, we are unable to see a principled and meaningful difference between objective and subjective practices. There is no bright line distinction between objective and subjective hiring criteria, because almost all criteria necessarily have both subjective and objective elements. For example, while the requirement of a certain test score may appear "objective," the choice of skills to be tested and of the testing instruments to measure them involves "subjective" elements of judgment. Such apparently "subjective" requirements as attractive personal appearance in fact include certain "objective" factors. Thus the terms merely represent extremes on a continuum, and cannot provide a line of demarcation to guide courts in choosing the appropriate analytic tool in a Title VII discrimination case.
 
 
 41
 Finally, we think a distinction between subjective and objective practices serves no legitimate purpose. To the contrary, preserving the distinction could serve to encourage employers to abandon "objective" criteria and practices in favor of "subjective" decision making as a means of shielding their practices from judicial scrutiny. It would subvert the purpose of Title VII to create an incentive to abandon efforts to validate objective criteria in favor of purely discretionary hiring methods. See Griffin v. Carlin, 755 F.2d 1516, 1525 (11th Cir.1985) ("Rather than validate education and other objective criteria, employers could simply take such criteria into account in subjective interviews.... It could not have been the intent of Congress to provide employers with an incentive to use such devices rather than validated objective criteria.").
 
 
 42
 g. Policy Considerations Support Impact Analysis
 
 
 43
 The defendants argue that the burden placed on an employer in an impact case is somehow made unduly onerous when the practices identified as having a disparate impact are subjective in nature. A class claim of disparate impact is essentially an allegation that a disparity in the position of nonwhites and whites, often proved through statistical evidence, is "the systemic result of a specific employment practice that cannot be justified as necessary to the employer's business." Segar, 738 F.2d at 1267. As in a disparate treatment claim, the initial burden is on the plaintiffs. To establish a prima facie case of disparate impact, the plaintiffs must prove that a specific business practice has a "significantly discriminatory impact." Teal, 457 U.S. at 446, 102 S.Ct. at 2530; Dothard, 433 U.S. at 329, 97 S.Ct. at 2726-27. To reiterate, plaintiffs' prima facie case consists of a showing of significant disparate impact on a protected class, caused by specific, identified, employment practices or selection criteria.
 
 
 44
 Once the plaintiff class has shown disparate impact caused by specific, identifiable employment practices or criteria, the burden shifts to the employer. The crucial difference between a treatment and an impact allegation is the intermediate burden on the employer. To rebut the prima facie showing of disparate impact the employer may refute the statistical evidence as in the treatment claim and show that no disparity exists. But if the employer defends by explaining the reason for the disparity he must do more than articulate that reason. He must prove the job relatedness or business necessity of the practice. Moody, 422 U.S. at 425, 95 S.Ct. at 2375. The Supreme Court's decision in Burdine that the burden of persuasion always stays with the plaintiff in a treatment case expressly preserved the different allocation of burdens in an impact case. The Court stated that it "recognized that the factual issues, and therefore the character of the evidence presented, differ when the plaintiff claims that a facially neutral employment policy has a discriminatory impact on protected classes." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252 n. 5, 101 S.Ct. 1089, 1093 n. 5, 67 L.Ed.2d 207 (1981).
 
 
 45
 Precisely what the employer must prove will vary with the factors of different job settings, but "[t]he touchstone is business necessity." Griggs, 401 U.S. at 431, 91 S.Ct. at 853. In our view, proving business necessity is no more onerous in a case involving subjective practices than one involving objective practices, because in either case the employer is the person with knowledge of what his practices are and why he uses the methods and criteria he does, as well as the person with superior knowledge of precisely how his employment practices affect employees. See Segar, 738 F.2d at 1271; Pouncy v. Prudential Insurance Co., 668 F.2d 795, 801 (5th Cir.1982). The burden of proof on the employer is commensurate with the greater burden on the plaintiff to prove impact and to establish the causal connection between the practices and the impact. Once a challenged practice which causes disparate impact is identified, it does not place an unfair burden to ask an employer to justify the challenged practice.[6] We emphasize that while proving business necessity may be "an arduous task," Bunch v. Bullard, 795 F.2d 384, 393 n. 10 (5th Cir.1986), this burden will not arise until the plaintiff has shown a causal connection between the challenged practices and the impact on a protected class.
 
 
 46
 In weighing competing policy considerations urged by the defendants, primary guidance is provided by the purpose of Title VII, namely to eradicate the existence and effects of discrimination in employment. Treatment and impact analyses are interpretive constructions intended to provide guidance in evaluating the evidence presented in discrimination cases so as best to effectuate Congressional intent. In this case, that intent is best realized by a decision to apply disparate impact analysis to subjective employment practices.
 
 CONCLUSION
 
 47
 For the reasons discussed, we hold that disparate impact analysis can be applied to subjective employment practices. To the extent our prior decisions have held to the contrary they are expressly overruled.
 
 
 48
 We return this cause to the panel to reconsider the district court's disposition of the plaintiffs' claims in light of this decision.
 
 
 49
 SNEED, Circuit Judge, with whom GOODWIN, WALLACE, and J. BLAINE ANDERSON, Circuit Judges, join, concurring separately:
 
 
 50
 I agree that en banc resolution of a conflict, such as existed with respect to Heagney v. University of Washington, 642 F.2d 1157 (9th Cir.1981), and Wang v. Hoffman, 694 F.2d 1146 (9th Cir.1982), is the appropriate means of unraveling a tangle of conflicting holdings in circuit law.
 
 
 51
 On the other hand, while I agree that the mere fact that an employment practice is subjective does not shield it from attacks under the disparate impact theory, my view of the problems this case presents is different enough from that of the majority that it is best to set forth in some detail both my summary of the facts and my analysis of the law with respect to those facts. My thesis, in a nutshell, is that the disparate impact theory is designed to be applied to certain types of cases only. The majority opinion, although not holding otherwise, might unfortunately be read to suggest that the disparate treatment and disparate impact theories may be used interchangeably in any given fact situation. While this would read the opinion too broadly, it is certainly fair to say that the majority opinion provides no guidance in describing the circumstances to which each theory is applicable. This guidance is necessary to prevent the conversion of all, or substantially all, Title VII class actions into disparate impact cases.
 
 
 52
 I now turn to the facts which will be set out somewhat differently than in the majority opinion.
 
 I.
 FACTS
 
 53
 The five defendant canneries are located in remote and widely separated areas of Alaska. They operate for a short period each year, during the summer salmon runs, and lie vacant for the remainder of the year.
 
 
 54
 The cannery operations begin in May or June, a few weeks before the anticipated fish run, with a period known as the preseason. The companies bring in workers to assemble the canning equipment, repair winter damage to the facilities, and prepare the cannery for the onset of the canning season. Shortly before the fishing season, the cannery workers arrive. Cannery workers, who comprise the bulk of the summer work force, generally are unskilled individuals who staff the actual canning lines. These workers remain at the cannery as long as the salmon run lasts; they are guaranteed payment for a minimum number of weeks if the run is shorter than usual. When the canning is completed, the cannery workers depart and the canneries are disassembled and winterized by postseason workers.
 
 
 55
 Salmon are extremely perishable and must be processed within a short time after being caught. Because the fish runs are of short duration, cannery work involves intense and long hours. The canning process proceeds as follows. Independent fishermen catch the salmon and turn them over to companyowned boats, which transport the fish from the fishing grounds to the canneries. Cannery workers eviscerate the fish, remove the eggs, clean the fish, and place them in cans. Next, the cannery workers cook the salmon under precise time and temperature requirements established by the Food and Drug Administration (FDA) and inspect the cans to ensure that proper seals are maintained on the top, bottom, and sides.
 
 
 56
 Because of their remote location, the canneries must be completely self-contained, employing individuals in a great variety of jobs. Machinists and engineers, for example, maintain the canning equipment. Quality control personnel conduct the FDA-required inspections and record-keeping. Boat crews operate transport boats. Other tasks require, for example, cooks, carpenters, store-keepers, bookkeepers, and beach gangs for dock yard labor and construction. Because of the brevity of the salmon runs, most of the jobs are of short duration. The few permanent employees either staff the home offices in Seattle, Washington and Astoria, Oregon in the winter, or maintain the winter shipyard in Seattle.
 
 
 57
 Another consequence of the canneries' location in remote areas is that the companies hire the necessary employees from various areas--primarily Alaska and the Pacific Northwest--and transport them to and from the canneries each year. They provide housing and mess halls at the canneries throughout the season.
 
 
 58
 Most of the cannery worker jobs, which are unskilled, are held by minorities. Most of the higher-paying jobs are held by caucasians. The plaintiffs presented statistical evidence demonstrating the breadth of this disparity. Relying on this evidence, they challenged the following hiring practices the canneries use in filling the higher-paying jobs at issue: (1) the use of separate hiring channels and word-of-mouth recruitment for skilled workers; (2) nepotism; (3) rehire policies; and (4) the lack of objective job qualifications. They also alleged racial discrimination in the canneries' messing and housing practices.
 
 
 59
 The district court evaluated all of the practices under the disparate treatment model; it found for the defendants, holding that they had shown nondiscriminatory motivations for these practices. It also evaluated some of the practices, those it characterized as "objective," under the disparate impact model; it found for the defendants under this analysis also.
 
 
 60
 The panel to which this case was assigned agreed with the district court that disparate impact analysis should be applied only to "objective" factors. Its conclusion was based on Heagney v. University of Washington, 642 F.2d 1157 (9th Cir.1981), but conflicted with Wang v. Hoffman, 694 F.2d 1146 (9th Cir.1982). See Atonio v. Wards Cove Packing Co., 763 F.2d 1120, 1132 & n. 6 (9th Cir.1985).
 
 
 61
 As already mentioned, we granted en banc review to address the circumstances under which it is appropriate to employ the disparate impact analysis. Part II of this opinion sets forth an analytic framework for determining when the disparate impact approach should be used. Part III applies that framework to the facts of this case.
 
 II.
 ANALYTIC FRAMEWORK
 
 62
 The relevant section of Title VII, 42 U.S.C. Sec. 2000e-2(a)(2), provides:
 
 
 63
 It shall be an unlawful employment practice for an employer
 
 
 64
 ....
 
 
 65
 ... to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
 
 
 66
 The Supreme Court's interpretation of this provision has identified two separate theories of recovery: disparate treatment and disparate impact. Put briefly, a plaintiff alleging disparate treatment must demonstrate intentional discrimination. See, e.g., International Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854-55 n. 15, 52 L.Ed.2d 396 (1977). A disparate impact claim, on the other hand, does not require proof of discriminatory intent. Instead, it attacks "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another." Id. at 336 n. 15.
 
 
 67
 The Supreme Court has not clearly articulated the types of cases to which each of these theories should be applied. In Teamsters, for example, the Court said that "[e]ither theory may, of course, be applied to a particular set of facts." Id. One could conclude from this comment that both theories were applicable to all Title VII claims without regard to their specific nature.
 
 
 68
 This conclusion, however, is plainly inconsistent with the Supreme Court's disposition of Furnco Construction Corp. v. Waters, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). In that case, the Supreme Court expressly refused to apply disparate impact analysis. The plaintiffs were individual bricklayers who were not hired because they applied at the jobsite, rather than through the regular application process. The Supreme Court's explanation consisted of a footnote stating that the case was not similar to Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (evaluating standardized tests under disparate impact analysis), Dothard v. Rawlinson, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) (evaluating height and weight requirements under disparate impact analysis), or Teamsters (a class action disparate treatment case). See Furnco, 438 U.S. at 575 n. 7, 98 S.Ct. at 2948-49 n. 7.[1]
 
 
 69
 It should not be surprising that the lower courts have employed different explanations of this footnote in Furnco. Two basic explanations have emerged, one represented by Wang and the other by Heagney. The Heagney approach restricts the disparate impact analysis to objective practices; the Wang approach applies it to all practices.[2] I think both of these approaches ignore how the alleged practice functions. As a consequence, one is too broad and the other too narrow.
 
 
 70
 Moreover, the distinction between "objective" and "subjective" employment practices or criteria is not as clear as these cases suggest. A requirement, for example, that an applicant pass a qualifications test is "objective." On the other hand, hiring on the basis of good looks and appearance is by no means entirely "subjective." Specific aspects of these two criteria can be identified and to the extent so identified become "objective." Only an employment practice resting entirely on personal whim and caprice can be said to be wholly "subjective." In short, "subjective" and "objective" are only the extremes of a continuum, like night and day. I believe they are inappropriate tools for defining the bounds of disparate impact and disparate treatment analysis. Moreover, even "subjective" practices, as the majority points out, have the same capacity to cloak discrimination that in Griggs led the Supreme Court to create disparate impact analysis.
 
 
 71
 I think the key to understanding the proper spheres of disparate impact and disparate treatment analysis is found in the nature of the claims of discrimination. A brief recapitulation of the nature of the two forms of analysis demonstrates this point. To establish a prima facie disparate impact case requires that the practice be identified, that there exists an impact adverse to a protected class, and that the practice caused the adverse impact.
 
 
 72
 Obviously, the burden of establishing this prima facie case will preclude certain claims from receiving disparate impact analysis. For example, the requirement that the plaintiffs identify a specific practice prevents plaintiffs from "launch[ing] a wide ranging attack on the cumulative effect of a company's employment practices." Spaulding v. University of Washington, 740 F.2d 686, 707 (9th Cir.) (quoting Pouncy v. Prudential Ins. Co. of Am., 668 F.2d 795, 800 (5th Cir.1982)), cert. denied, 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984). But cf. Griffin v. Carlin, 755 F.2d 1516, 1523-25 (11th Cir.1985) (applying disparate impact analysis to the end result of a hiring process, without requiring the plaintiffs to articulate which specific practices caused the impact in question). Absent this requirement, the disparate impact test would put on employers the burden of demonstrating the business necessity of each facet of their employment decisions, even if the plaintiffs could demonstrate no disparate impact caused by some of those facets. See Pouncy, 668 F.2d at 801. Accordingly, the analysis requires the plaintiff to identify some specific practice; the defendant must show the business necessity of that specific practice.
 
 
 73
 The requirement of causation also prevents disparate impact analysis of certain claims. For example, a plaintiff's class consisting of children cannot state a cause of action against an employer merely because his recruiting practices designed to obtain quarry workers overlooked children. No significant number of children are qualified to be quarry workers. Because there are not a significant number of children so qualified, the employer's practices in recruiting quarry workers cannot be said to have caused any impact on the children. At a minimum, then, the causation element requires demonstration by the plaintiff that significant numbers of the plaintiff class are qualified for the job. See, e.g., Segar v. Smith, 738 F.2d 1249, 1274 (D.C.Cir.1984), cert. denied, 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985); Grant v. Bethlehem Steel Corp., 635 F.2d 1007, 1019 (2d Cir.1980) (noting that some members of the plaintiff class were clearly qualified, despite the employers' protestations to the contrary), cert. denied, 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981).[3]
 
 
 74
 Once the plaintiff has established a prima facie case, the employer must either attack one of the three elements of the prima facie case or demonstrate that the practice is a "business necessity." The latter can be shown only when the practice is job-related and serves to help identify the qualities necessary to perform the work satisfactorily. See, e.g., Dothard v. Rawlinson, 433 U.S. 321, 332 n. 14, 97 S.Ct. 2720, 2728 n. 14, 53 L.Ed.2d 786 (1977); Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971).
 
 
 75
 The disparate treatment structure is quite different. There the prima facie case typically requires that the aggrieved show (1) that he is a member of a protected class, (2) that he applied, (3) that he was rejected, and (4) that after the rejection the position remained open and applicants having qualifications similar to the aggrieved's continued to be accepted. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The burden then is on the employer to show that a non-discriminatory reason explains his conduct. See id. at 802-03, 93 S.Ct. at 1824-25. Thereafter, the aggrieved may attempt to show that the proffered explanation is pretextual. See id. at 804, 93 S.Ct. at 1825. The ultimate burden of persuasion remains on the aggrieved to show discriminatory treatment. Texas Dep't. of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981).
 
 
 76
 The Supreme Court cases to date have applied disparate impact analysis only to practices akin to counting, weighing, and measuring, an even narrower limitation than the "objective"/"subjective" distinction some courts have adopted. I think the appropriate distinction can be more accurately delineated. As I see it, disparate impact analysis should be applied whenever the plaintiff claims that the employer has articulated an unnecessary practice that makes the plaintiff's true qualifications irrelevant. This differs from a treatment case, in which the plaintiff claims that, knowing the plaintiff's qualifications, the employer refused to hire him because of race or some other impermissible characteristic. A showing of discriminatory intent is extremely difficult, if not impossible, when an employer asserts that he did not hire an individual because of a facially neutral requirement. Faced with this reality the Court in Griggs held that employers must justify such requirements under the business necessity test.
 
 
 77
 The crucial issue in any Title VII case is into which category the employer's alleged wrong properly fits. Has the employer allegedly failed by reason of some facially neutral employment practice to ascertain the qualifications of a protected class, or has the employer ignored the known qualifications for a discriminatory reason? The nature of the wrong as pleaded and proved determines the nature and extent of the plaintiff's burden. Because it would be futile in an impact case to require the plaintiff to show discriminatory intent, the plaintiff's burden principally is one of showing the "impact" of the practice. Proof of the "impact" goes far toward establishing a failure to consider the qualifications of a substantial number of the protected class. At that point the employer's response logically can only be that the practice serves to ascertain a relevant job-related qualification; that is, the practice rests on business necessity.
 
 
 78
 This burden of showing a business necessity has no place if the plaintiff's grievance is that his qualifications, although available to and known by the defendant employer, have been ignored because of a discriminatory motive. To treat this as an impact case rather than a treatment case would relieve the plaintiff of the burden of establishing a discriminatory intent and impose on the defendant the burden of demonstrating that what he did was done because of business necessity. In the context of a treatment case, this would amount to imposing the burden on the defendant to prove that he did not discriminate.
 
 
 79
 Thus, it is necessary to determine from the pleadings and the evidence the nature of each claim the plaintiff makes. Although it is true that neither impact nor treatment analysis can be tied irrevocably to a specific category of practices, it is also true that they properly cannot be employed interchangeably. It follows that in this case each claim must be analyzed to determine which type of analysis, impact or treatment, is proper. An employee, alleging only that the employer's failure to hire him is based on race or religion, cannot force the employer to prove that his failure was due to business necessity. This remains true even if the plaintiff shows that others of plaintiff's race or religion also had not been hired. The employee has alleged a treatment case and the burdens are allocated as McDonnell Douglas and Burdine indicate. On the other hand, such an allocation is entirely inappropriate where the allegation is that the test employed by the employer disqualifies all applicants other than Protestants. This pleads an impact case.
 
 
 80
 Complications arise when the practices lend themselves to being alleged as the basis of either a treatment or impact case. Equally complicated are situations in which multiple practices are employed and some properly suggest impact analysis while others treatment analysis. In such situations, a court should evaluate each practice separately, applying the appropriate analysis to each practice. Guided by this analysis, I now proceed to examine the district court's treatment of the plaintiff's claims in this case.[4]III.
 
 APPLICATION TO THIS CASE
 
 81
 A. Separate Hiring Channels and Word-of-Mouth Recruitment
 
 
 82
 The first practice the plaintiffs challenge is the use of separate hiring channels and word-of-mouth recruitment for cannery workers and for the skilled at-issue jobs. The use of separate hiring channels can insulate an employer's decisionmaking process from any need to consider the qualifications of unwanted minorities. Accordingly, disparate impact analysis of this claim is appropriate.[5]
 
 
 83
 But this does not mean that Atonio's claim must prevail. As part of his prima facie case, he must establish causation. In turn, that element requires proof that a substantial number of the class possess the qualifications legitimately required for the skilled jobs. The district court did not make any findings on this point. Because the record is unclear, I would remand for further factfinding on this point. See Icicle Seafoods, Inc. v. Worthington, --- U.S. ----, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739 (1986). For each job that the district court finds a substantial number of qualified plaintiffs, the district court must evaluate the business necessity of separate hiring channels.
 
 B. Nepotism
 
 84
 The second hiring practice the employees challenge is nepotism. The district court subjected this claim to impact analysis pursuant to our decision in Bonilla v. Oakland Scavenger Co., 697 F.2d 1297, 1303-04 (9th Cir.1983), cert. denied, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 838 (1984). It rejected the claim, finding that the individuals were hired because of their abilities rather than their relation to the employers. Excerpt of Record (E.R.) at 324-25. I might construe this as a finding that the canneries had no practice of nepotism, apart from their admitted practice of word-of-mouth recruitment. If this were so, the plaintiffs' challenge would fail. Because the appropriate legal standard was less than clear at the time the district court considered this case, I would remand this claim back to that court for further consideration.
 
 C. Rehire Policies
 
 85
 The third practice the employees challenge is the rehire policies of the employers. Like the practices discussed above, rehire policies insulate the employer from the need to consider the applications of possibly qualified minorities. The district court properly applied disparate impact analysis to this practice, but rejected the employees' challenge because it found the practice was justified by business necessity, viz. the short season and the dangers of the industry. E.R. at 334. Because this finding is not clearly erroneous, I would affirm the district court's disposition of this claim without addressing other aspects of it.
 
 D. Lack of Objective Employment Criteria
 
 86
 Next, the employees challenge the employers' lack of objective employment criteria. The district court found as a fact that the employers did have objective criteria. The defendants' pretrial order listed a number of qualifications assertedly necessary for the jobs in question. After hearing evidence, the court explicitly found that these qualifications were "reasonably required for successful performance." E.R. at 299. Although some evidence in the record suggests that these qualifications were not applied evenhandedly, discrimination in application raises a treatment claim. It is only the choice of qualifications that is subject to disparate impact analysis. I cannot say that the district court's decision was clearly erroneous. Accordingly, I would affirm its disposition of this claim.
 
 E. Housing and Messing Practices
 
 87
 Finally, the employees allege racial discrimination in the canneries' housing and messing practices. I do not think this claim is properly susceptible to disparate impact analysis. In no way do these practices enable an employer to reject prospective minority employees without considering their qualifications. The only Title VII challenge to these practices can be under the disparate treatment theory. The district court's rejection of the claim on that theory, E.R. at 336-37, was not clearly erroneous. Accordingly, I would affirm the district court's treatment of this claim.
 
 
 88
 In summary, I would affirm the district court's dismissal of the plaintiffs' claims regarding rehire policies, subjective employment criteria, and racial discrimination in housing and messing practices. I would reverse the district court's dismissal of the separate hiring channels and nepotism claims and would remand for further factfinding.
 
 
 
 [1]
 The Second, Third, Sixth, Tenth, Eleventh and District of Columbia Circuits apply impact analysis to subjective practices and criteria. See, e.g., Zahorik v. Cornell University, 729 F.2d 85 (2d Cir.1984); Grant v. Bethlehem Steel Corp., 635 F.2d 1007 (2d Cir.1980), cert. denied, 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981); Wilmore v. City of Wilmington, 699 F.2d 667 (3d Cir.1983); Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc., 690 F.2d 88 (6th Cir.1982); Hawkins v. Bounds, 752 F.2d 500 (10th Cir.1985); Lasso v. Woodmen of World Life Insurance Co., Inc., 741 F.2d 1241 (10th Cir.1984), cert. denied, 471 U.S. 1099, 105 S.Ct. 2320, 85 L.Ed.2d 839 (1985); Coe v. Yellow Freight System, Inc., 646 F.2d 444 (10th Cir.1981); Williams v. Colorado Springs School District No. 11, 641 F.2d 835 (10th Cir.1981); Griffin v. Carlin, 755 F.2d 1516 (11th Cir.1985); Segar v. Smith, 738 F.2d 1249 (D.C.Cir.1984), cert. denied, 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985). The Fourth Circuit does not apply impact analysis to subjective criteria. See, e.g., E.E.O.C. v. Federal Reserve Bank, 698 F.2d 633 (4th Cir.1983), rev'd on other grounds sub nom. Cooper v. Federal Reserve Bank, 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984); Pope v. City of Hickory, 679 F.2d 20 (4th Cir.1982); but see Brown v. Gaston County Dyeing Machine Co., 457 F.2d 1377 (4th Cir.), cert. denied, 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972); Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir.), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971). The Fifth, Seventh and Eighth Circuits have reached conflicting results, sometimes applying impact analysis and sometimes refusing to apply it. See, e.g., Page v. U.S. Industries, Inc., 726 F.2d 1038 (5th Cir.1984); Rowe v. General Motors Corp., 457 F.2d 348 (5th Cir.1972) (applying impact analysis); contra Bunch v. Bullard, 795 F.2d 384, 394 (5th Cir.1986); Vuyanich v. Republic National Bank, 723 F.2d 1195 (5th Cir.) cert. denied, 469 U.S. 1073, 105 S.Ct. 567, 83 L.Ed.2d 507 (1984); Pegues v. Mississippi State Employment Service, 699 F.2d 760 (5th Cir.), cert. denied, 464 U.S. 991, 104 S.Ct. 482, 78 L.Ed.2d 679 (1983); Carroll v. Sears Roebuck & Co., 708 F.2d 183 (5th Cir.1983); Pouncy v. Prudential Insurance Co., 668 F.2d 795 (5th Cir.1982); Griffin v. Board of Regents, 795 F.2d 1281, 1288-89 and n. 14 (7th Cir.1986) (refusing to apply impact analysis); contra Clark v. Chrysler Corp., 673 F.2d 921 (7th Cir.) cert. denied, 459 U.S. 873, 103 S.Ct. 161, 74 L.Ed.2d 134 (1982); Talley v. United States Postal Service, 720 F.2d 505 (8th Cir.1983), cert. denied, 466 U.S. 952, 104 S.Ct. 2155, 80 L.Ed.2d 541 (1984); Harris v. Ford Motor Co., 651 F.2d 609 (8th Cir.1981) (refusing to apply impact analysis); contra Gilbert v. Little Rock, 722 F.2d 1390 (8th Cir.1983), cert. denied, 466 U.S. 972, 104 S.Ct. 2347, 80 L.Ed.2d 820 (1984)
 
 
 [2]
 See, e.g. Page v. U.S. Industries, Inc., 726 F.2d 1038, 1054 (5th Cir.1984) (applying impact analysis to subjective employment practices in accord with Rowe v. General Motors Corp., 457 F.2d 348 (5th Cir.1972) because "promotional systems which depend upon the subjective evaluation and favorable recommendation of immediate supervisors provide a ready vehicle for discrimination."); E.E.O.C. v. Federal Reserve Bank, 698 F.2d 633, 639 (4th Cir.1983), rev'd on other grounds sub nom. Cooper v. Federal Reserve Bank, 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984) (allegedly discriminatory promotion policies could not be subjected to impact analysis because the subjective criteria did not amount to an "objective standard, applied evenly and automatically" as are a diploma requirement, a test or a minimum height or weight requirement)
 
 
 [3]
 See, e.g., Larson, 3 Employment Discrimination Sec. 76.36 n. 90 (1984 & Supp. Nov. 1985) (collecting cases)
 
 
 [4]
 See, e.g. Grant v. Bethlehem Steel Corp., 635 F.2d 1007 (2d Cir.1980), cert. denied, 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981) (a post Furnco decision in which, on virtually identical facts, the court held that word of mouth hiring should be evaluated as discriminatory treatment and for discriminatory impact. Id. at 1016-17.); Bauer v. Bailar, 647 F.2d 1037, 1043 (10th Cir.1981) ("Subjective hiring and promotion decisions, particularly where made in the absence of specific standards and guidelines[,] may not go unexplained if there is a significantly disproportionate non-selection of members of a [protected] group...."). See also cases cited supra, n. 1
 
 
 [5]
 See D. Baldus and J. Cole, Statistical Proof of Discrimination Sec. 1.23 (1980 & Supp.1985) ("The logic of the disparate impact doctrine appears to apply to covert legitimate policies, no matter how discretionarily they are applied, as well as it does to overt nondiscretionary criteria.")
 
 
 [6]
 We note that a related concern is that the "impact model is not the appropriate vehicle from which to launch a wide ranging attack on the cumulative effect of a company's employment practices." Spaulding, 740 F.2d at 707. However, this is not such a case. The class has not simply complained about the overall consequences of a collection of unidentified practices; rather it has identified specific employment practices which cause adverse impact. These specific practices which cause adverse impact may be considered individually and collectively
 
 
 [1]
 Comprehension of the court's treatment of the impact claim in Furnco is complicated by Justice Marshall's explanation. He argues that the Court's rejection of the impact claim was merely an affirmance of the circuit court's affirmance of the district court's rejection of that claim on the merits. 438 U.S. at 584-85, 98 S.Ct. at 2953 (Marshall, J., concurring in part, dissenting in part.) Because this explanation is not consistent with the explanation of the Court's own opinion, I refuse to rely on it
 
 
 [2]
 The decisions in other circuits in fact reflect a more complicated situation, with a variety of different positions. It is fair to say, however, that some courts apply disparate impact analysis only to practices closely akin to the counting, measuring, and weighing evident from the existing Supreme Court cases. See, e.g., Carroll v. Sears, Roebuck & Co., 708 F.2d 183, 188-89 (5th Cir.1983) (Wisdom, J.) (refusing to apply disparate impact analysis to claims of discrimination in training, promotion, and classification of employees); Harris v. Ford Motor Co., 651 F.2d 609, 611 (8th Cir.1981) (per curiam) (refusing to apply disparate impact analysis to system allowing firing based on evaluations of supervisors). Other courts apply disparate impact analysis to any identifiable practice whatsoever. See, e.g., Rowe v. Cleveland Pneumatic Co., 690 F.2d 88, 92-93 (6th Cir.1982) (per curiam) (applying disparate impact analysis to system allowing rehiring based on opinions of foremen); Clark v. Chrysler Corp., 673 F.2d 921, 927 (7th Cir.) (applying disparate impact analysis to word-of-mouth recruitment and discriminatory selection of hiring channel), cert. denied, 459 U.S. 873, 103 S.Ct. 161, 74 L.Ed.2d 134 (1982)
 
 
 [3]
 I do not mean to say that plaintiffs must introduce statistical proof based on qualifications of applicants who have been rejected for the job. Obviously, the applicant pool itself could fail to represent adequately the number of qualified minorities because of discriminatory recruitment practices. See, e.g., Dothard v. Rawlinson, 433 U.S. 321, 330, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977). Those discriminatory recruitment practices themselves are subject to disparate impact analysis. But it is important to remember that a prima facie case that the recruitment practices in question have caused a disparate impact requires demonstration of a significant number of qualified persons overlooked because of the challenged practices
 
 
 [4]
 I acknowledge that this position has not been articulated in the decisions of other courts that have examined similar questions. A brief survey of the law in other circuits reveals, however, that most of the decisions in this area are consistent with the approach I suggest
 The Second Circuit has applied disparate impact analysis to employment systems that relied on subjective employee evaluations. Zahorik v. Cornell Univ., 729 F.2d 85, 95-96 (2d Cir.1984). Under my approach, such decisions would often be subject to the disparate impact analysis.
 The Third Circuit applied disparate impact to invalidate a test that partially based promotions on administrative skills. In that case, the employer had a practice of assigning whites to jobs that developed the administrative skills tested for by the exam. Accordingly, reliance on the administrative skills was improper. See Wilmore v. City of Wilmington, 699 F.2d 667, 675 (3d Cir.1983).
 None of the Fourth Circuit decisions commonly cited in this area seems to have dealt specifically with the objective/subjective distinction. For instance, in EEOC v. Federal Reserve Bank, 698 F.2d 633, 638-39 (4th Cir.1983), rev'd on other grounds sub nom. Cooper v. Federal Reserve Bank, 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984), the court flatly stated that disparate impact analysis could be applied only to objective practices. In that case, however, the plaintiffs apparently identified no specific practice; instead, they seem to have been challenging the entire employment process. I would reach the same result, refusing to apply disparate impact unless the plaintiffs can identify a specific practice that causes a disparate impact. Similarly, Pope v. City of Hickory, 679 F.2d 20 (4th Cir.1982), was a disparate treatment case; the plaintiffs alleged discrimination in general, not that it was implemented through some specific practice. Brown v. Gaston County Dyeing Machine Co., 457 F.2d 1377 (4th Cir.), cert. denied, 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972), failed to distinguish between the impact and treatment analysis at all. Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir.), cert. dismissed pursuant to Sup.Ct.R. 60, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971), is actually precedent for application of disparate impact analysis to more subjective systems, despite the flat statement in EEOC. In Robinson, the Fourth Circuit applied disparate impact to use of a seniority system that was at least partially subjective.
 The decisions in the Fifth Circuit display a similar lack of resolution in drawing a line between objective and subjective practices. Several panels of that circuit have thought that the law of the circuit precluded application of the disparate impact analysis to subjective factors, relying on Pouncy v. Prudential Insurance Co. of America, 668 F.2d 795 (5th Cir.1982). See Vuyanich v. Republic Nat'l Bank, 723 F.2d 1195, 1201-02 (5th Cir.), cert. denied, 469 U.S. 1073, 105 S.Ct. 567, 83 L.Ed.2d 507 (1984); Carroll v. Sears, Roebuck & Co., 708 F.2d 183, 188-89 (5th Cir.1983) (Wisdom, J.); Pegues v. Mississippi State Employment Serv., 699 F.2d 760, 764 (5th Cir.), cert. denied, 464 U.S. 991, 104 S.Ct. 482, 78 L.Ed.2d 679 (1983). But at least one recent Fifth Circuit panel noted Pouncy and went on to apply disparate impact analysis to a system that based promotions on the subjective evaluations of foremen. See Page v. United States Indus., 726 F.2d 1038, 1045-46 (5th Cir.1984). The clarity of the ostensible rule of Pouncy is also not evident from that opinion itself. In fact, the opinion had alternative holdings: first, that the plaintiffs had not established that the practices caused the impact; and, second, that the practice was not susceptible to the disparate impact analysis because of its subjectivity. 668 F.2d at 800-01. I also note that in none of the Fifth Circuit cases following Pouncy would plaintiffs clearly have prevailed under my disparate impact analysis anyway. See Vuyanich, 723 F.2d at 1201-02 (plaintiff apparently failed to identify a specific practice); Carroll, 708 F.2d at 188-90 (apparently the plaintiffs failed to show causation); Pegues, 699 F.2d at 764-65 (practice not by an employer, but by a state employee commission).
 In the Sixth Circuit, disparate impact analysis has been applied in cases challenging rehiring based on unguided opinions of foremen. See Rowe v. Cleveland Pneumatic Co., 690 F.2d 88, 92-93 (6th Cir.1982) (per curiam).
 The Seventh Circuit, in a case strikingly similar to this one, applied disparate impact analysis, as I do here, to word-of-mouth recruitment and selection of hiring channels. See Clark v. Chrysler Corp., 673 F.2d 921, 927 (7th Cir.), cert. denied, 459 U.S. 873, 103 S.Ct. 161, 74 L.Ed.2d 134 (1982).
 In the Eighth Circuit, I do find cases that are not reconcilable with my approach. That circuit has maintained a firm refusal to apply disparate impact analysis to what it characterizes as "subjective" practices. See, e.g., Gilbert v. Little Rock, 722 F.2d 1390 (8th Cir.1983) (applying treatment analysis to a system relying on individual discretion), cert. denied, 466 U.S. 972 (1984); Talley v. United States Postal Serv., 720 F.2d 505, 506-07 (8th Cir.1983) (refusing to apply impact analysis), cert. denied, 466 U.S. 952, 104 S.Ct. 2155, 80 L.Ed.2d 541 (1984); Harris v. Ford Motor Co., 651 F.2d 609 (8th Cir.1981) (per curiam) (same). For the reasons articulated in the text, I think these cases are incorrect. I note that this footnote demonstrates that my approach is consistent with the great majority of existing authority.
 The Tenth Circuit has uniformly applied disparate impact analysis to practices that use subjectivity to cloak discrimination. See, e.g., Hawkins v. Bounds, 752 F.2d 500, 503 (10th Cir.1985); Lasso v. Woodmen of the World Life Ins. Co., 741 F.2d 1241, 1245 (10th Cir.1984), cert. denied, 471 U.S. 1099, 105 S.Ct. 2320, 85 L.Ed.2d 839 (1985); Coe v. Yellow Freight Sys., 646 F.2d 444, 450-51 (10th Cir.1981) (dicta); Williams v. Colorado Springs, Colo. School Dist. No. 11, 641 F.2d 835 (10th Cir.1981).
 I have already noted the inconsistency of one recent Eleventh Circuit decision with my opinion. See Griffin v. Carlin, 755 F.2d 1516, 1523-25 (11th Cir.1985) (applying disparate impact analysis to the end result of a hiring process without requiring the plaintiffs to identify a particular practice). That disagreement as to the requirements of the prima facie case does not extend, however, to the scope of the impact analysis itself. I would apply impact analysis to the facts of Griffin, only reaching a different result.
 Finally, the D.C. Circuit has recently articulated a complicated position, not completely in accord with either of the common positions exhibited in the other circuits. See Segar v. Smith, 738 F.2d 1249, 1270-72 (D.C.Cir.1984), cert. denied, 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985). In that opinion, the panel discussed the following scenario. After a plaintiff establishes a prima facie treatment case, defendants frequently advance an employment practice as a legitimate reason for their hiring decisions. According to the Segar panel, the employers' articulation of that practice as a defense to the treatment case establishes a prima facie impact case against the practice in question. Accordingly, the defendants must defend the practice under the business necessity test required by disparate impact analysis.
 
 
 [5]
 I recognize that this claim is quite similar to the claim presented in Furnco Construction Corp. v. Waters, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), a claim to which the Court refused to apply disparate impact analysis, id. at 575 & n. 7, 98 S.Ct. at 2948-49 & n. 7. In that case, the Court emphasized the "importance of selecting people whose capability has been demonstrated to defendant." Id. at 574, 98 S.Ct. at 2948 (quoting the lower court opinion). If this were treated as a job qualification, under my analysis the impact analysis would apply, but the plaintiffs would have failed to establish a prima facie case because they were not qualified. Most importantly, however, the Furnco footnote is just not specific enough to resolve the question before us. I do not think it is useful to search at length for an explanation for the Furnco result the Court declined to give us