NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

LITMATH, LLC, *Plaintiff/Appellant*,

*v.*

UNITED STATES FIRE INSURANCE COMPANY, *Defendant/Appellee*.

No. 1 CA-CV 22-0223
FILED 6-1-2023

Appeal from the Superior Court in Maricopa County
No. CV2014-014302
The Honorable Katherine Cooper, Judge

**AFFIRMED**

COUNSEL

Ahwatukee Legal Office PC, Phoenix
By David L. Abney
*Co-counsel for Plaintiff/Appellant*

Poli Moon & Zane PLLC, Phoenix
By Michael N. Poli, Lawrence R. Moon
*Co-counsel for Plaintiff/Appellant*

Taylor Young Appeals PLLC, Phoenix
By Taylor C. Young
*Co-counsel for Plaintiff/Appellant*

Christian Dichter & Sluga PC, Phoenix
By Jeffrey O. Hutchins, Stephen M. Dichter, Gena L. Sluga
*Counsel for Defendant/Appellee*

---

## MEMORANDUM DECISION

Judge Randall M. Howe delivered the decision of the court, in which Presiding Judge Samuel A. Thumma and Judge Anni Hill Foster joined.

---

**H O W E**, Judge:

¶1        Litmath, LLC appeals the trial court's order granting judgment as a matter of law ("JMOL") to United States Fire Insurance Company ("USFIC"). For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2        Litmath, an Arizona limited liability company, is owned and managed by husband-and-wife Ivan and Lilian Vachovsky. In 2006, Litmath purchased a commercial property in Phoenix, Arizona, ("Property") and later purchased insurance for the Property through USFIC. The Property had been leased as a data and call center until January 2008 and remained vacant thereafter.

¶3        Litmath's insurance policy with USFIC provided that, in the event of loss or damage, the insured would be entitled to the actual cash value ("ACV") of the property at the time of the loss or damage. The ACV is "the measure of the value of the item at the time of the damage, not at the time of its original installation or subsequent repair and replacement." If the insured used that amount to repair or replace the damaged property, the insured would be entitled to receive additional payment necessary to repair or replace the property, the replacement cost value ("RCV").

¶4        To receive the RCV rather than merely the ACV, the insured must actually repair or replace the damaged property "as soon as reasonably possible after the loss or damage." If the insured did so, the insurer would pay the least of the following three options: (1) the limit of insurance applicable to the property, (2) the cost to replace the damaged property with one of "comparable material and quality" that is "[u]sed for the same purpose," or (3) "[t]he amount actually spent that is necessary to repair or replace the lost or damaged property."

¶5        In October 2010, a hailstorm damaged the vacant Property's roof, air conditioning, and ventilation equipment. Shortly after the hailstorm, Litmath submitted a claim on the Property but withdrew it, stating that the damage was not substantial. At no point did Litmath repair the Property. Two years later, after a construction company contacted Litmath and informed it that the Property had indeed been damaged, Litmath reopened its claim.

¶6        After reopening the claim, Litmath hired its own contractors, consultants, and public adjustors ("PA"), each of which provided various estimates of loss. USFIC hired an independent adjuster and consultants to evaluate the claim; its total estimate of loss was $1.25 million, while the ACV estimate was about $922,000. The difference in estimates depended on the scope of repairs to the Property's cooling towers or battery system. In February 2013, USFIC paid Litmath the $922,000 ACV value. After receiving the funds, Litmath hired another PA, who produced various estimates of the loss, eventually settling on $2.1 million.

¶7        In December 2014, Litmath sued USFIC for breach of contract and insurer bad faith. Litmath alleged that USFIC breached the implied covenant of good faith and fair dealing in "lowballing" the amount of Litmath's loss and not adequately and timely investigating Litmath's claim. "Lowballing" in the insurance industry "refers to an insurance company paying less on a claim than it knows or it should know how much it owes . . . The policyholder is not getting the full benefit that's owed under their policy." Litmath sought compensatory and punitive damages as well as attorneys' fees. In January 2015, the Vachovskys sold the Property for $1.33 million.

¶8        After receiving the complaint, USFIC requested under the insurance policy that the parties first undergo an appraisal process because of their conflicting damage valuations. When Litmath declined, USFIC obtained an order staying the case until completion of the appraisal process to determine the claim's value. The policy required that in the event of disagreement about the Property's value or amount of loss, each party would select an impartial appraiser, and the appraisers would select a neutral umpire. If the two appraisers' valuations differed, the valuation would be submitted to the umpire.

¶9        Litmath and USFIC each chose an appraiser, who agreed on a neutral umpire. Litmath's appraiser opined the RCV to be $2.07 million, and USFIC's appraiser opined it to be $526,000. In December 2015, the umpire determined the RCV to be $1.755 million, and the ACV amount to

be $1.158 million. Within the next 30 days, USFIC paid Litmath $236,400, the difference between its ACV estimate and the umpire's estimate. USFIC paid Litmath a total of $1.158 million.

¶10            A few years after the appraisal, Litmath moved for partial summary judgment on the issue of an insurer's duty of good faith, arguing that USFIC was vicariously liable for punitive damages its employees and agents had caused. The court denied the motion. USFIC itself moved for summary judgment, arguing that the breach of contract claim was moot because it had fully paid whatever Litmath was owed at the time and that evidence showed that it never acted in bad faith. The court denied USFIC's motion on bad faith and found the breach of contract claim moot.

¶11            USFIC moved in limine to exclude testimony that Litmath could not afford to make repairs to the Property before it was sold because such testimony would be "fraud on the Court." At oral argument, USFIC also argued that it wanted to preclude testimony that the Vachovskys themselves could not afford to repair the Property. The court warned Litmath that "if the Court is going to permit anyone, on behalf of Litmath, to say Litmath couldn't afford to fix the building . . . [t]hat will open the door to cross-examination on the financials of Litmath or the principals involved . . . if there can be a connection established between the two."

¶12            The trial court held a jury trial on the bad faith claim. On the second day of trial and on direct examination, Mrs. Vachovsky testified that upon receiving the ACV payment, she and her husband, on behalf of Litmath, called contractors to make the repairs. The contractors, however, told them that the repairs would cost twice the ACV amount. The Vachovskys did not use the $922,000 ACV payment to repair the property because they thought the payment too low to do the repairs. Mrs. Vachovsky also testified that USFIC undervalued Litmath's claim because the ACV payment was not enough to repair the Property based on their PA's $2.1 million estimate.

¶13            While still on direct examination, Litmath's counsel asked Mrs. Vachovsky without objection:

> Q. So the defendant wants to know why Litmath didn't put its own money into this building and make the repairs on its own. Did Litmath have the financial wherewithal to do that?
>
> A. . . . [T]he only asset Litmath owned was the building, and there was no income coming from that.

Q. Did you and your husband have the independent financial wherewithal to have loaned money to Litmath in order to make the repairs to the building?

A. Yes.

Q. Would that have hurt your family at all financially if you would have loaned the money?

A. No.

¶14 Later, on cross-examination, USFIC's counsel asked Mrs. Vachovsky:

Q. If it had cost a million dollars to repair the building out of your own pocket, could you have done that without imperiling any interest of your family?

. . .

A. We could have done it without impairing the interest of the family.

¶15 Throughout Mrs. Vachovsky's cross-examination, Litmath objected to the questions and moved for mistrial. The court denied the motions and allowed the testimony because it was "within the proper scope of cross-examination of what was testified to on direct." USFIC continued to ask Mrs. Vachovsky how much money she and her husband could have spent on the Property:

Q. $3 million, not a problem?

A. I don't think, at the time, it would have been a problem.

. . .

Q. [Y]ou could have spent three, $4 million on this without hurting any family interest; isn't that right?

¶16 Litmath objected and a discussion ensued between counsel. Eventually, USFIC's counsel asked:

Q. [I]s the door open now? . . . You could have spent $4 million couldn't you? . . .

A. Keep in mind, I have already spent [$]4.6 million for this building . . . Both my husband and I loaned the money to Litmath, LLC to repay the mortgage because the mortgage was due. We were also paying and maintaining the building . . . So you're asking me, could you spend another four million? I think that would have been very risky for the family.

¶17 On the third day of trial, Litmath's insurance expert testified that the USFIC policy covered Litmath for the full RCV value through standard RCV language. He testified that under the policy, however, the insured must have first repaired or replaced the property to receive the claim's full RCV payment. He added that general contractors commonly used the ACV payment to begin repairs and then completed the project with the remaining RCV payment received later. An insured could use the ACV payment to repay a debt, but the insured would not be entitled to the full RCV payment. On the fourth day of trial, Litmath's PA also testified that Litmath had to spend the ACV money to receive the remainder of the full RCV amount. The same day, Litmath's real estate expert testified that, had the Property been repaired, it would have been worth more than $4 million.

¶18 After Litmath's case in chief, USFIC moved for JMOL. USFIC argued that no reasonable jury could find that USFIC acted unreasonably because Litmath's various repair estimations showed that its claim was "fairly debatable," that USFIC was not part of Litmath's decision to sell the property "as is" without making repairs, and that its actions did not cause diminution in the Property's value or loss of proceeds from its sale. USFIC argued last that Litmath could have easily repaired the building with money that USFIC paid or advanced by Litmath's members. Until Litmath used the ACV amount to repair the damage, it was not entitled to the RCV payment under the policy. The court heard oral argument and took the matter under advisement. Trial proceeded, and on the sixth day of trial the court granted the motion in part on the RCV payment issue. After USFIC presented its defense case, it renewed its JMOL motion on the issue of Litmath's lost proceeds at the sale.

¶19 The court then granted the motion in its entirety and dismissed the jury. The court found that the policy required Litmath to use the ACV amount to repair the Property before receiving the full RCV payment. If Litmath had made the repairs, it would have been entitled to the remaining portion of the claim, about $600,000 according to the court's calculation. But the court found that Litmath had the right not to repair the

Property and did not do so, and USFIC did not relieve Litmath from its obligations under the policy. USFIC's actions, therefore, were reasonable, and it was not obligated to pay Litmath more than the ACV amount under the circumstances. The court also found that USFIC's actions did not cause Litmath not to repair the Property. Rather, Litmath decided on its own not to repair the Property, use the ACV proceeds for other purposes, and to sell the Property "as is," which resulted in the diminished value. The court noted that even if the amount was insufficient to Litmath, the Vachovskys could have paid for additional repairs to the Property. Any loss from the sale resulted from Litmath's conduct. Litmath timely appealed.

## DISCUSSION

**¶20**      Litmath argues that the trial court erred (1) in disregarding the LLC framework and admitting evidence of the Vachovskys' personal finances because the evidence is irrelevant and (2) in granting USFIC's motion for JMOL because the evidence shows that USFIC committed the tort of bad faith against Litmath.

## I.      Admission of Evidence of the Vachovskys' Personal Finances

**¶21**      We will not disturb the trial court's ruling on the admissibility of evidence absent a clear abuse of discretion and resulting prejudice. *Lohmeier v. Hammer*, 214 Ariz. 57, 60 ¶ 7 (App. 2006). Although Litmath is correct that the evidence was initially inadmissible and irrelevant, Litmath opened the door to the evidence during Mrs. Vachovsky's direct examination. Under the "open door" doctrine "where one party injects improper or irrelevant evidence or argument, the 'door is open,' and the other party may have a right to retaliate by responding with comments or evidence on the same subject." *Pool v. Superior Court*, 139 Ariz. 98, 103 (1984). "The rule is most often applied to situations where evidence adduced or comments made by one party make otherwise irrelevant evidence highly relevant or require some response or rebuttal." *Id.* The party that opens the door typically is precluded from raising the error on appeal after first inviting the error. *State v. Lucero*, 223 Ariz. 129, 135 ¶ 17 (App. 2009) ("[I]nvited error precludes a party who causes or initiates an error from profiting from the error on appeal . . .[and] the offending party has no recourse on appeal.").

**¶22**      Here, the court did not err in admitting evidence of the Vachovskys' personal finances. Litmath opened the door to this evidence during Mrs. Vachovsky's direct examination. Without objection, Litmath's counsel asked her whether she and her husband had "the independent

financial wherewithal to have loaned money to Litmath in order to make the repairs." Without objection, she answered, "Yes." Counsel also asked her whether lending Litmath the money would have "hurt [her] family at all financially." Again, without objection, she replied, "No." She also testified that she and her husband had lent Litmath money before to pay the mortgage, and that Litmath did not repair the Property because USFIC undervalued its claim in paying about $922,000. All this was during her direct examination by Litmath's attorney.

¶23 By opening the door to the Vachovskys' finances, Litmath made the evidence relevant and admissible on the causation issue. The evidence was relevant to refute Litmath's claim that USFIC's conduct led Litmath to do a forced sale of the Property at a lower value and, as a result, caused Litmath's loss in proceeds. Showing that the Vachovskys had the money to repair the Property demonstrated that Litmath could have gained access to funds to repair the Property before selling it but chose not to do so. Thus, the evidence is relevant to demonstrate that USFIC did not act unreasonably or cause Litmath's alleged losses upon selling the Property.

¶24 Litmath argues that the evidence was unfairly prejudicial because USFIC did not assert an alter ego theory or present facts to pierce the LLC's veil. Litmath also argues that the elicited testimony led the jury to blame the Vachovskys as "greedy manipulators," even though Litmath relied on receiving the full RCV payment in good faith to commence repairs. Litmath has not shown unfair prejudice, however. The admissibility of evidence of the Vachovskys' personal wealth is not predicated on USFIC first piercing the corporate veil. The point of piercing the LLC's veil under an alter ego theory is to hold persons such as an LLC's members liable for the LLC's debts and obligations. *See Keg Restaurants Ariz., Inc. v. Jones*, 240 Ariz. 64, 73 ¶ 31 (App. 2016) ("[W]hen a subsidiary corporation is merely the parent corporation's alter ego and when observing the corporate form would work an injustice, a court may properly 'pierce the corporate veil' and hold the parent corporation liable for the acts of its subsidiary."). Admitting evidence of the Vachovskys' personal wealth was not to hold them liable for Litmath's debts or obligations, but to show that USFIC did not cause a diminution in the Property's value. *See infra* ¶¶ 29–30.

¶25 Further, while the Vachovskys were not obliged to lend Litmath money, *see* A.R.S. § 29–3304(A) (stating that an LLC's members are "not personally liable, directly or indirectly, by way of contribution or otherwise," for an LLC's liability solely because they are members), asking about their financial resources on direct examination—while precluding

cross-examination on the topic—could have produced misleading testimony on causation, that USFIC "lowballed" its payment and Litmath was indeed forced to sell the Property. This would have left a one-sided presentation for the jury's consideration. *Cf. E.E.O.C. v. Gen. Telephone Co. of N.W., Inc.*, 885 F.2d 575, 578 (9th Cir. 1989) ("[F]acilitating one-sided presentation of a defense prevents the factfinder from getting 'the full picture' of a defendant's conduct by precluding the plaintiff from enjoying a fair opportunity to challenge the evidence and the defendant's theory in offering it."). Thus, once Litmath's counsel opened the door to the Vachovskys' personal finances, USFIC was entitled to a "fair opportunity to challenge the evidence." *Id.* Even though the court dismissed the jury before they were asked to deliberate on the case, Litmath had opened the door, and the evidence added to the record. The trial court had authority to consider the "entire record" before it in rendering its decision. *See Schwab v. Ames Const.*, 207 Ariz. 56, 59 ¶ 15 (App. 2004). Litmath did not show, based on the record, how the admitted evidence unfairly prejudiced Litmath. *See Walsh v. Walsh*, 230 Ariz. 486, 494 ¶ 24 (App. 2012) (stating not all errors warrant reversal; this court will reverse only if a party suffers prejudice from the error, and the prejudice "appear[s] affirmatively from the record"). Therefore, Litmath has shown no reversible error.

## II.    Insurance Bad Faith

**¶26**        Initially, USFIC argues that Litmath waived the argument that the court erred in granting USFIC JMOL because it failed to develop it or cite portions of the record under Arizona Rule of Civil Appellate Procedure ("Rule") 13(a). Although some arguments on this issue are not fully developed, the brief is not so deficient as to warrant waiver. *See Ramos v. Nichols*, 252 Ariz. 519, 523 ¶ 10 (App. 2022) (stating that courts prefer to decide cases on their merits). We thus address Litmath's arguments.

**¶27**        We review a ruling on a JMOL motion de novo but view the evidence in the light most favorable to the nonmoving party. *Torres v. Jai Dining Servs. (Phx.) Inc.*, 252 Ariz. 28, 30 ¶ 9 (2021); *Spooner v. City of Phoenix*, 246 Ariz. 119, 123 ¶ 7 (App. 2018). The trial court considers "the entire record" in determining a JMOL motion. *See Schwab*, 207 Ariz. at 59 ¶ 15; *see also Glazer v. State*, 237 Ariz. 160, 167 ¶ 29 (2015) ("The standards for granting or denying a motion for JMOL and a motion for summary judgment are the same."). A court may properly grant JMOL against a party only when a "reasonable jury would not have a legally sufficient evidentiary basis to find for the party" on an issue that is necessary to the party's claim or defense. Ariz. R. Civ. P. 50(a); *Dupray v. JAI Dining Servs. (Phx.), Inc.*, 245 Ariz. 578, 582 ¶ 11 (App. 2018). We will uphold a grant of

JMOL if "the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Jones*, 240 Ariz. at 72 ¶ 28 (quoting *Felder v. Physiotherapy Assocs.*, 215 Ariz. 154, 162 ¶ 36 (App. 2007)).

¶28 Bad faith insurance claims derive from the duty of good faith and fair dealing. *Clearwater v. State Farm Mut. Auto. Ins. Co.*, 164 Ariz. 256, 259 (1990). An insurance company breaches that duty, and "the tort of bad faith arises[,] when the insurance company intentionally denies, fails to process or pay a claim without a reasonable basis for such action." *Cavallo v. Phx. Health Plans, Inc.*, 254 Ariz. 99, 104 ¶ 19 (2022) (quoting *Noble v. Nat'l Am. Life Ins. Co.*, 128 Ariz. 188, 190 (1981)). The insured has the burden to prove that its insurer "unreasonably investigate[d], evaluate[d], or processe[d] a claim (an 'objective' test), and either [knew] it [was] acting unreasonably or act[ed] with such reckless disregard that such knowledge may be imputed to it (a 'subjective' test)." *Nardelli v. Metro. Grp. Prop. & Cas. Ins. Co.*, 230 Ariz. 592, 597–98 ¶ 19 (App. 2012); *Tritschler v. Allstate Ins. Co.*, 213 Ariz. 505, 516 ¶ 32 (App. 2006).

¶29 Here, Litmath did not demonstrate that USFIC acted unreasonably or intended to do so. The record shows that USFIC timely investigated, evaluated, and processed Litmath's claim. After Litmath reopened its claim in 2012, two years after the hailstorm, USFIC hired an independent adjuster and consultants to evaluate the claim. They produced an estimate shortly thereafter and paid Litmath about $922,000 for the ACV amount. Meanwhile, Litmath hired different adjusters, contractors, and consultants who produced varying estimates before presenting its final estimate in January 2014. Because of the difference in loss valuation, USFIC requested the parties seek an appraisal by a neutral umpire pursuant to the policy. The umpire estimated the RCV amount to be $1.755 million, and the ACV amount to be $1.158 million. Within 30 days of the umpire's estimate, USFIC paid Litmath the $236,400 difference in the ACV amount to match the umpire's ACV estimate. Even if USFIC had retained biased adjusters to provide a low-balled estimate, USFIC reasonably and promptly complied with the umpire's estimate.

¶30 Moreover, Litmath did not show that USFIC's actions caused the Property to be sold for $1.33 million or caused a forced sale of the Property. The record shows that USFIC followed the policy in not providing the remaining portion of the RCV amount unless Litmath commenced repairs to the Property. The insurance policy and testimony from Litmath's experts are clear that had Litmath used the ACV amount to

repair the Property, USFIC would have paid it the remaining RCV amount. This is a common provision in insurance contracts. *See, e.g.*, *Tritschler*, 213 Ariz. at 510 ¶ 9. Also, Litmath's real estate expert testified that, had Litmath repaired the Property, it would have sold for more than $4 million. But Litmath chose not to make the repairs and instead sold the Property for a lower value before the appraisal ended at the beginning of litigation. Litmath then chose to use the money to pay off the Vachovskys for loans they had made to Litmath, which it was entitled to do. As the evidence revealed, however, Litmath did not then have money for the repairs. Yet the Vachovskys were financially capable of supplying Litmath with the funds to do the repairs. Litmath's choices caused its losses. USFIC's actions were reasonable, and where an insurer acts reasonably, it has not committed bad faith. *Trus Joist Corp. v. Safeco Ins. Co. of Am.*, 153 Ariz. 95, 104 (App. 1986). The court considered the entire record in rendering its decision, and Litmath did not show that USFIC committed bad faith practices.

**¶31**　　　　Litmath nevertheless argues that USFIC's breach of the duty of good faith and fair dealing absolved it from repairing the Property and that the Vachovskys did not use the ACV payment for repairs because USFIC "lowballed" the ACV amount. But Litmath never had a duty to repair the Property, as its insurance expert testified, nor did USFIC have a duty under the policy to pay Litmath the RCV amount before it started the repairs. *See Rawlings v. Apodaca*, 151 Ariz. 149, 155 (1986) (The insured is not entitled "to payment of claims that are excluded by the policy, nor to protection in excess of that which is provided for in the contract, nor to anything inconsistent with the limitations contained in the contract."). Litmath could have used the ACV payment to start repairs and then subsequently receive the full RCV payment to complete them. Litmath's insurance expert testified that general contractors typically work on projects this way. And although Litmath may not have had the funds to repair the Property because the Vachovskys used USFIC's ACV payment for another purpose, evidence shows that the Vachovskys themselves had the financial capability to lend Litmath up to $3 million if the ACV payment did not suffice to cover the repairs. Then they would have received the RCV payment.

**¶32**　　　　Even if evidence of their personal finances had not been admissible, Litmath did not suffer prejudice. *See* Ariz. R. Civ. P. 61 ("Unless justice requires otherwise, an error in admitting or excluding evidence . . . is not grounds for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order."); *see also supra* ¶¶ 24–25. The record provides sufficient evidence—even without that

of the Vachovskys' personal finances—that USFIC did not act in bad faith and did not preclude Litmath from repairing the Property. USFIC timely and reasonably followed the insurance policy by paying Litmath the ACV value that the neutral umpire estimated. Litmath's own conduct in failing to repair the Property with the full ACV amount precluded a profitable sale. USFIC was entitled to judgment regardless of the admissibility of the Vachovskys' financial ability to fund the repairs. Therefore, the court did not err in granting USFIC's JMOL motion.

## CONCLUSION

¶33 For the foregoing reasons, we affirm. Both parties request attorneys' fees and costs under Rule 21, A.R.S. § 12–341, and A.R.S. § 12–341.01, which authorizes a discretionary fee award to the successful party in an action arising out of a contract. Litmath also requests costs under A.R.S. § 12–331 and A.R.S. § 12–342. USFIC is the successful party on appeal and may recover reasonable attorneys' fees and taxable costs incurred in this court upon compliance with Rule 21.



AMY M. WOOD • Clerk of the Court
FILED:    AA